IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HID GLOBAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1769 (GBW) |
| | ) | (CONSOLIDATED) |
| | ) | |
| VECTOR FLOW, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM ORDER</u>**

The Court entered an Order assigning me to serve as a special master to hear and decide discovery disputes in this litigation. (D.I. 191). Pending before me is Plaintiff HID Global Corp.'s ("HID") motion to compel Defendant Vector Flow, Inc. ("Vector Flow") to produce "a representative version of the accused software that (1) is configured for customers as opposed to a version that includes 'test/dummy data', (ii) includes all features that Vector Flow can see and use, in particular features directed to creating 'rules,' and (iii) includes all features directed to creating rules." (Pltf. Letter to S.M. K. Keller Regarding Operational Software Production Dispute, Apr. 21, 2023).

## I. Background

The Special Master's understanding of the facts concerning this dispute comes from reviewing the parties' submissions, including the exhibits, expert and fact witness declarations, and argument on the motion that was held on April 27, 2023.

HID issued Requests for Production 3, 22, and 119-222 to Vector Flow requesting all versions of Vector Flow's source code and Executable Code for any Accused Product, one functional copy of each Accused Product, and the latest version (revision) of each instance of

1

Vector Flow's Executable Software that was configured or customized for a customer, including but not limited to, each version that has been used by Vector Flow or the customer. (*See* HID Requests for Production 3, 22 to Vector Flow, dated Apr. 22, 2022; HID Requests for Production 119-112 to Vector Flow, dated Mar. 24, 2023; *see also* HID Requests for Production Nos. 83-86 to Individual Defendants, dated Mar. 24, 2023). "Executable Code" was defined by HID to mean "any machine code or object code, including but not limited to, all computer program files that have been compiled." (*See id.*).

Vector Flow objected to these requests on a few over-arching grounds: (1) that it has already provided HID with remote access to the underlying source code for its customer-facing software; (2) that that operational software already produced includes the same functionality provided to Vector Flow customers; and (3) the request seeks confidential third-party information that is not in its possession, custody, or control. Vector Flow further stated that while it already provided access to this information, and the underlying source code, that to the extent HID can identify features or functionality missing from the operational software, Vector Flow is willing to meet and confer to discuss. (*See* Vector Flow's Resp. & Obj. to Requests for Production 3, 22, dated June 17, 2022; Vector Flow's Resp. & Obj. to Requests for Production 119-122, dated Apr. 24, 2023; *see also* Individual Def.'s Resp. & Obj. to Requests for Production Nos. 83-86, dated Apr. 24, 2023).

HID also issued a request for inspection of Vector Flow's "latest version (or revision) of each operational instance(s) of Executable Code for any Accused Product, that has been configured or customized for [insert customer name], including but not limited to, each such version (or revision) of each operational instance(s) that has been used by You or [insert customer name]." (*See* Def. Vector Flow's Obj. & Responses to Pltf. HID Corp.'s First Set of

Requests for Inspection of Documents to Vector Flow (Nos. 2-5), Apr. 20, 2023). Vector Flow objected to these requests on the same grounds. (*See id.*)

Vector Flow produced a copy of its demonstration software to HID on April 7, 2023. (Pltf. Apr. 21 Letter to S.M. K. Keller, at 1). HID is not, however, content with the produced version of the operational software. The parties met and conferred a few times regarding HID's concerns and on multiple occasions Vector Flow provided various explanations or instructions on how to operate the software so that they could obtain the information needed. HID's letter brief outlines that the issues with the produced software are: (1) it only includes test/dummy data that does not correspond to actual users or events; (2) that HID could not see all features and rules that Vector Flow can see, in particular, related to the creation of rules, and (3) that HID could not see all features and rules that Vector Flow's customers can see. (*Id.*). It further argues that it is necessary for HID to analyze the rules because it is a "key limitation" of the Asserted Patents. (*Id.* at 2). The "rules" claim limitation is further set forth in HID's direct and indirect infringement contentions. (*Id.* at Ex. D, 3-4 (and the attached claim charts)).

## II.     Standard of Review

Rule 26 provides that parties may obtain discovery on nonprivileged information that is *relevant* to any party's claim or defense and proportional to the needs of the case while considering the burden and the expense on the producing party. Fed. R. Civ. P. 26(b)(1) (emphasis added). Federal Rule of Civil Procedure 34 provides the procedures through which a party must produce electronically stored information ("ESI"). Fed. R. Civ. P. 34. Rule 34 requires that the information be produced "in a form [] in which it is ordinarily maintained or in a reasonably usable form or forms." Fed. R. Civ. P. 34(b)(2)(E)(ii).

While HID has requested both production and an inspection of the operational software, I understand from HID that the request for on-site inspection is an alternative if their concerns cannot be remedied by the production.

### III. Discussion

The parties do not dispute that the requested operational software is not relevant, nor burdensome to produce. As stated above, HID's concerns are: (1) their perception that the produced version is not configured for a customer; (2) their inability to access certain features of the software that either appear non-functioning in the produced version; and (3) their inability to run certain features because they believe the test/dummy data is insufficient. HID's expert, Dr. Mark Jones, submitted a declaration in connection with this dispute outlining the various issues with their accessing the software.

(1) Concern 1: the produced version is not configured for a customer

As to HID's perception that the produced version is not configured for a customer, it argues that when it reviewed a You Tube demonstration webinar by Vector Flow, it allegedly showed "live data" from a customer. (Pltf. Letter Brf. at 2). In response, Vector Flow submitted a factual declaration from the Director of Engineering at Vector Flow, Mr. Abhimanyu Raj Singh, which states that Vector Flow developed a "standard version of its software" that is provided to customers and which they may update from time to time. (*See* Def. Apr. 26 Resp. Letter to S.M. Keller, at Exh. A, ¶8). This standard version contains all the features and functionality present in the software Vector Flow provides to its customers and is the same in the demonstration software that was produced (aside from two features to be discussed later). (*Id.* at ¶9). The software is then hosted by the customer on their premises or on a private cloud. While a fully-hosted option is available, no customer currently uses this option. (*Id.* at ¶¶5, 7). Vector

Flow's expert, Mr. Thompson, also submitted a declaration in connection with Vector Flow's responsive brief demonstrating that he was able to recreate any of the sections of the webinar that concerned HID to show that the software as produced to HID has the same functionality as the version on the webinar.  (*Id.* at Exh. B, ¶¶5-25).

I am not sure what further relief I can offer HID on this issue.  Vector Flow has stated on the record at argument and through its letter briefing and declaration, that the software provided to HID is "the same software that a Vector Flow customer would receive" with two exceptions.  (*Id.* at 2 and Exh. A & B).  Those two exceptions relate to features that are not functional or visible in any software because they are still under development.  HID does not cite to any authority in its letter brief that would require Vector Flow to finish the development to create the software with these features.  At argument, HID cited to *Aperture Net LLC v. Cambium Networks,Inc.*, C.A. No. 21-298-RGA, 2022 U.S. Dist. LEXIS 17841 (Feb. 1, 2022).  The patent in that case had method claims related to wireless communication systems.  Defendant sought dismissal of the direct infringement claims for failure to state a claim.  *Id.*  The Court found that plaintiff had plausibly alleged a direct infringement claim where it alleged that "its employees internally test and use, research and develop and troubleshoot the Accused Product" and contained claim charts further showing how use directly infringes the patent.  *Id.* at *9.

Underlying the holding in *Aperture*, however, was the assumption that an employee could use the features of the accused product to perform the allegedly infringing method.  It is not clear to me from the papers or argument that while there may be source code already produced pertaining to these two features in Vector Flow's software, that the features can be used (i.e., that the source code for those features is actually executable) at this time.  Mr. Singh's declaration states that they are not yet completed. For example, Mr. Singh states that the "Alarm Playbook"

5

and "Playbook Template" are not completed and that as a result Vector Flow does not have a functional version of its software that includes this feature. (Def. Apr. 26 Resp. Letter Brf. at Exh. A, ¶12).[1]

I cannot order something to be produced that does not exist. I am comfortable with Vector Flow's representation that what they have provided to HID is the same software as provided to its customers. There is nothing in the record that suggests the declarations provided by the fact witness, Mr. Singh, or Vector Flow's expert witness, Mr. Thompson, are inaccurate or not credible. Moreover, I cannot order Vector Flow to produce something that is not within its possession, custody or control. Once purchased, Vector Flow's customers maintain their software on their private cloud or drives. Vector Flow does not have any access to the software once it is provided to the customer. As such, I do not order Vector Flow to produce anything other than what it already has.

As to the "Alarm Playbook" and "Playbook Template" features, with the information presented to me at this time, it does not appear that there is a way for Vector Flow to produce non-functioning features to HID. That said, I order HID to issue an interrogatory to Vector inquiring about these two features, and specifically whether the features could function (can be executed) internally by Vector Flow through testing or otherwise. By this I would like Vector Flow to either confirm or deny (and provide the factual basis for) in a certified response, their position that no one can actually test these two features. If that is not the case, and if Vector Flow is able to execute these features internally (even if not on the demonstration software), it

---

[1] HID references certain JIRA attachments to further substantiate its argument that the "Alarm Playbook" is available. Vector Flow notes in its response that upon investigating, the JIRA attachments cited by HID correspond to JIRA ticket VS-2230 which does not relate to an "Alarm Playbook" feature at all. (Def. Resp. Letter Brf. at 3).

must produce a version to HID that has working versions of these features and explain to HID how to access them.

(2) Concern 2: the ability to fully access certain features

Second, HID argues that it is unable to fully access certain features of the operational software. These allegedly inaccessible features are the "Playbook" features. HID's concerns about these features arise from their review of the Vector Flow webinar and their inability to locate the same content in the produced operational software. As stated above, Mr. Thompson provided a detailed declaration outlining how he was able to access each feature in the webinar cited by HID in the operational software produced by Vector Flow and provided screen shots as further evidence. (Def. Resp. Letter Brf. at Exh. B). Mr. Singh also stated in his declaration, that while the data in the webinar appears to be actual customer data, that it is not, and instead is test data. (Def. Resp. Letter Brf. at Exh. A, ¶11).

(3) Concern 3: insufficient test/dummy data to run certain features

HID's final concern relates to its inability to run certain features because the test/dummy data was insufficient (my understanding is that insufficient in this context means there was not enough for certain features to run). This exact argument as to the insufficiency of the data was first raised at argument, however, I understand it to be subsumed within HID's argument that it was seeking to compel a version where all features can be seen and used.

As to Concerns 2 and 3 discussed above, I believe there to be some disconnect between the parties on how to operate the software or use certain features. Therefore, I order that each party have one expert from each side schedule a virtual meeting where screens can be shared and they can walk through the software together and help HID's expert locate what HID believes are problematic areas. Three days ahead of the meeting, HID should provide Vector Flow with a list

of issues or questions it would like worked through during this meeting so that Vector Flow's expert can be prepared for the meeting and the time spent by the parties can be efficient.  If ahead of the meeting, Vector Flow also determines there is not enough test data present for certain features to be functional, it should add that data to the version provided so that those features can run.  There shall be no recordings of this meeting either by video or transcription and nothing said or done during this meeting can be used in either expert's report or by either side in questioning the experts.  Essentially, what happens in that meeting stays in that meeting.  One lawyer from each side may attend but they are not to participate in the discussions between the expert. Their only role is to be there for educational purposes and logistical questions.  I would also like to be present during this meeting so the parties should provide me a link to the meeting ahead of time and coordinate with my staff my availability.  If possible, I would like it completed by May 10, 2023.  The meeting should be no longer than one day.  My hope is that following this meeting, HID's concerns will be resolved and the parties can move forward with their review and contentions.  Because this may be an expensive exercise, I reserve my ability to shift the costs of this meeting should it turn out that every concern HID had about the produced software was incorrect, and that all functioning features could be accessed and used.

Dated: April 30, 2023            /s/ Karen E. Keller
                                 Special Master Karen E. Keller, Esq.