IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HID GLOBAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1769 (GBW) |
| | ) | (CONSOLIDATED) |
| | ) | |
| VECTOR FLOW, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM ORDER</u>**

The Court entered an Order assigning me to serve as a special master to hear and decide discovery disputes in this litigation. (D.I. 191). Pending before me is Defendant Vector Flow, Inc.'s ("Vector Flow") motions to compel Plaintiff HID Global Corporation ("HID") to produce documents and supplemental interrogatory responses. (Def. Ltr. to S.M. K. Keller, dated July 7, 2023).

**I.  Background**

The Special Master's understanding of the facts concerning these disputes comes from reviewing the parties' submissions, including the exhibits, discovery objections and responses, submitted deposition testimony, and argument on the motion that was held on July 14, 2023.

Vector Flow's motion raises four general issues: (1) Vector Flow's request for additional financial information responsive to RFPs 63, 64, 69, 70 and 71; (2) Vector Flow's request for responsive documents from HID's SharePoint, "Deployment" folder, and other central databases and repositories; (3) Vector Flow's request for further supplementation of Interrogatory Nos. 22 and 24; (4) Vector Flow's request that HID re-produce the Salesforce documentation at HID-02592-65 to include omitted information.

1

For purposes of this motion, it is important to note that the parties have raised numerous discovery disputes (on both sides) over the course of the past few months.  The timing of these disputes, and subsequent rulings, meant that documents and information was being produced right up through fact depositions and that the deposition period was quite condensed.  While it was important that these issues be decided, I did not want my rulings to interrupt the overall schedule for this matter, particularly the trial date, so it was necessary for the parties to continue forward as disputes were raised and decided.

The issues raised by Vector Flow as part of this motion were raised with HID (and to some extent, the Special Master), before fact discovery closed.  The parties continued to try to work out these matters through meet and confers, but depositions of HID's witnesses and subsequently, HID's opening damages expert report, made clear to Vector Flow that the issues remained ripe and ready for decision by the Special Master.  I agreed to hear the issues in early July following letter submissions.

**II.    Standard of Review**

Rule 26 provides that parties may obtain discovery on nonprivileged information that is relevant to any party's claim or defense and proportional to the needs of the case while considering the burden and the expense on the producing party.  Fed. R. Civ. P. 26(b)(1).

Rule 26 further requires a plaintiff to provide "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered."  Fed. R. Civ. P. 26 (a)(1)(A)(iii).

### III. Discussion

**A. Issue 1:** Vector Flow's request for additional financial information responsive to RFPs 63, 64, 69, 70 and 71.

Vector Flow's initial motion requested three categories of documents that have allegedly not been produced by HID: (1) financial statements referred to by HID as "LockPacks"; (2) the breakdown of costs underlying the financial spreadsheets created for the litigation and produced by HID; (3) Mr. Ahmed's financial reports, and any further financial documentation from his laptop or shared files. It is my understanding following argument on July 14, 2023 and HID's representations made in its letter brief on July 10, 2023 (Pltf. Ltr. to S.M. Keller, dated July 10, 2023), that Vector Flow is no longer moving to compel the "LockPack" documents and therefore this part of Vector Flow's motion is denied as moot. Vector Flow still seeks: (1) Mr. Ahmed's documents on his computer, including but not limited to, any breakdown of costs relied on in the produced spreadsheet(s); (2) underlying data supporting the produced spreadsheet categories, including, direct costs, direct labor, selling expenses and research and development costs on a quarterly and annual basis.

Vector Flow argues that the requested information is highly relevant to its damages defense and responsive to earlier served requests for production. (*See* Def. Ltr. to S.M. Keller, dated July 7, 2023, at 1-2). HID is seeking, in part, lost profits as part of its damages in this matter. (*Id.*; *see also id.* at Exh. I (Schoettelkotte Expert Report on Damages, dated July 3, 2023)). Vector Flow served discovery requests related to damages, including Requests for Production 63, 64, 65, 66, 69, 70, 71. Requests 63 and 64 seek financial statements "sufficient to show" HID's revenues, costs (including a breakdown of [HID's] costs), profits, and losses on a quarterly basis since 2015, and financial statements "sufficient to show" HID's research and development expenditures for the HID Safe product on a quarterly basis since 2015. (*See* Def.

3

Ltr. to S.M. Keller, dated July 7, 2023, Exh. A at 14).  Request 65 seeks all documents related to any damages suffered as a result of the alleged misappropriation of trade secrets, including "any computation" of alleged damages.  (*Id.*).  Request 66 seeks the same for damages related to patent infringement. (*Id.* at 15).  Requests 69-71 seek documents "sufficient to show" pricing, projected future sales and sales of HID Safe on a quarterly basis from 2015-present.  (*Id.* at 15).

HID produced its witness, Mr. Ahmed, for deposition on certain 30(b)(6) topics related to damages, including Topics 28-29 (related to all sales, revenues, profits, costs, margins, and financial accountings regarding HID Safe and HID).  (*Id.*, Exh. B at 7-8; Ahmed Depo. Tr. 76:16-77:23).  During his deposition, Mr. Ahmed testified that he was the one who prepared the financial statements and sales document produced in the litigation.  (Ahmed Depo. Tr. 78:19-79:12).  He also testified that aside from those litigation-created documents, he does not believe he was otherwise asked to turn over any documents.  (*Id.* at 79:17-80:2).  In response to questions concerning how HID tracks and stores financial information, Mr. Ahmed stated that most is kept in its business intelligence tool, Oracle Analytics Cloud, HFM and Oracle ERP and if information or reports are needed, they would query those systems to generate a report.  (*Id.* at 54:10-55:14, 55:15-56:7).   He also stated that when he would pull financial reports, he would store those on his computer on a local drive, and likely a OneDrive backup.  (*Id.* at 56:17-57:10). The quarterly financial reports, according to Mr. Ahmed, took about 30 minutes to an hour to create.  (*Id.* at 58:252-59:1).  When pressed on the details about the cost categories provided in the produced spreadsheets, he only was able to provide general, vague answers.  (*See, e.g.*, *id.* at 145:9-15, 148:3-7, 150:17-19).

In its opening expert report on damages, HID's expert as part of his calculation of incremental profits for HID's lost profits theory, determined specific costs to commercialize the

4

HID Safe product in the "but for" world. (*See* Def. Ltr. to S.M. Keller, dated July 7, 2023, Exh. I at 141-143 (Schoettelkotte Expert Report Relating to HID Global's Damages)). The report also references research and development expenses. (*Id.* at 37). The only references relied on by Mr. Schoettelkotte for these numbers are "discussions with Asim Ahmed" and Mr. Ahmed's deposition transcript. (*See, e.g., id.* at 37 n.203-204, 677-678). Mr. Schoettelkotte ultimately relies on these high-level numbers to reach HID's lost profits damages number. (*Id.* at 143).

HID does not argue that the information sought by Vector Flow is not responsive or relevant, nor does it claim burden in producing such information. (*See* Pltf. Letter to S.M. Keller, dated July 10, 2023, at 2-3, and Exh. 2-3). Instead, it argues that because the requests were for documents "sufficient to show" that it provided "the best and most accurate financial details pertaining to HID Safe in the form of both annual and quarterly spreadsheets." (*See id.*). It also argues that Vector Flow had the ability to question Mr. Ahmed in more detail on these issues at his deposition but did not do so. (*Id.* at 2-3). When counsel for HID was asked during argument about the burden of producing this information, HID argued that the information is not kept in the ordinary course of business, the information may not be in the form that Vector Flow wants, they don't want to put up another witness, and there is no good cause to amend the scheduling order to allow the production.

The summary spreadsheets produced by HID (and found at Exh. 2 and 3 to their letter), are akin to Rule 1006 summaries of financial information that is not otherwise found at HID in that format in the ordinary course of business. Fed. R. Evid. 1006. Pursuant to that Rule, the documents underlying the summary must be produced. *U.S. v. Bertoli*, 854 F. Supp. 975, 1052 (D.N.J. 1994) (the underlying documents to a summary chart must be produced). As stated above, HID does not argue that the underlying financial information is not relevant. In fact,

damages disclosures "lacking supporting documentation that would allow the opposing party to 'independently analyze' a lost profits claim violate Rule 26. *Champion Foodservice, LLC v. Vista Food Exch., Inc.*, 2016 U.S. Dist. LEXIS 112980, *35-36 (N.D. Ohio Aug. 23, 2016) (quoting *Acuity Brands Lighting, Inc. v. Bickley*, No. 5:13-CV-366-DLB-REW, 2015 U.S. Dist. LEXIS 177183, 2015 WL 10551946, at *2 (E.D. Ky. Nov. 30, 2015) (disclosure lacking supporting documentation that would allow the opposing party to independently analyze the claim violates Rule 26) (citing *Bessemer*, 596 F.3d at 370), *report and recommendation adopted sub nom. Acuity Brands, Inc. v. Bickley*, No. CV 13-366-DLB-REW, 2016 U.S. Dist. LEXIS 38470, 2016 WL 1171541 (E.D. Ky. Mar. 24, 2016) (internal citations omitted)). Moreover, Vector Flow requested documents of the type that it now refuses to produce. As in *Godo Kaisha IP Bridge 1 v. TCL Comm'n Tech. Hldgs., Ltd., et al.*, the evidence is clearly relevant to the calculation of damages, in this case, lost profits, and Vector Flow "should not be required to blindly accept attorney-generated summary spreadsheets without access to the underlying factual data." C.A. No. 15-634-JFB-SRF, Memo. Order (D. Del. Mar. 8, 2018) (overruling objections to R&R finding financial information relevant and discoverable). Mr. Ahmed, as a 30(b)(6) witness on these spreadsheets was unable to reliably answer questions about each of the categories and the underlying information and HID's opening damages expert report did not provide any further information to back up the disclosed amounts. *Id.*

The cases distinguished by Magistrate Judge Fallon in her underlying opinion in *Godo Kaisha*, are similarly distinguishable here. *Godo Kaisha IP Bridge 1 v. TCL Comm'ns Hldgs., Ltd.*, C.A. No. 15-634-JFB-SRF, Magistrate Judge Memo. Order (D. Del. Dec. 14, 2017). In *Whitserve LLC v. Computer Patent Annuities North Am., LLC*, the court ordered a compilation spreadsheet of financial information instead of the production of millions of financial documents.

2006 WL 6654877, at *1-2; *see also In re Certaian Compact Flourescent Reflector Lamps, Products Containing Same & Components Thereof*, USITC Inv. No. 337-TA8-872, Order No. 22, 2013 WL 3361882, at *2 (U.S.I.T.C. July 2, 2013) (declining to require production of underlying data whre there was no question concerning its accuracy or reliability). Here, there is no argument by HID that the underlying documents or information would be voluminous or that it would be burdensome or time-consuming to produce. In fact, Mr. Ahmed was able to pull the reports produced for this litigation in about 30 minutes to an hour. (Ahmed Depo. Tr. at 58:25-59:1). As in *Sciele Pharma, Inc., et al. v. Lupin, Ltd., et al.*, the parties here are "bitterly litigating" the case, and it is "not surprising" that Vector Flow "does not want to accept [HID's] chart at face value." C.A. No. 09-00037-RBK-JS, D.I. 545, Order, at 5-8 (D. Del. Aug. 27, 2012). I therefore order HID to produce a breakdown on a quarterly and annual basis for all line items listed on the financial spreadsheet produced by HID at HID-002443534. I also order a production of any financial reporting documents or data on Mr. Ahmed's computer or Mr. Ahmed's OneDrive folder. Arguably, those documents should have been collected and produced in the first instance and other than arguments about prejudice, HID makes no burden argument as to their production now. At this time, however, I do not order a further deposition, as Mr. Ahmed was, and could have been further questioned by Vector Flow on these categories, although I find it unlikely he would have provided further information based on his existing testimony. This production should take place as soon as possible prior to Vector Flow's expert report responding to Mr. Schoettelkotte's Damages Report.

> **B. Issue 2:** Vector Flow's request for responsive documents from HID's SharePoint, "Deployment" folder, and other central databases, repositories.

Vector Flow next seeks responsive documents from various HID central databases and repositories. (Def. Ltr. to S.M. Keller, July 7, 2023, at 2-4). Due to the stage of the case, and in

7

order to try and decrease any burden on HID, as to the central repositories and databases, Vector Flow is only asking for additional information so the parties can confer on a supplemental production. (*Id.* at 2).

1. Central Repositories Generally[1]

During the course of my involvement in the case, it is clear that HID produced documents from such central repositories as its Wiki, SAFE version 4 development documents, JIRA, Salesforce (subject to a separate dispute discussed below), and custodial documents. HID witnesses, however, have testified to such other potential repositories where relevant information may be stored like Microsoft Teams (Bordeaux "running list"), CRM system (sales/business opportunities), and the financial databases discussed by Mr. Ahmed and ruled on above. During meet and confers with Vector Flow and at argument on this motion, HID also stated that everything that would be found in a central repository would also be found attached to an email, and therefore if an email hit on a search term, the document from that repository would have been produced.

The ESI Order entered in this case specifically contemplates searching of non-custodial data sources. See D.I. 50 at 3(b) and 4(b). HID's Rule 26 disclosures noted that documents related to the litigation may be "maintained in cloud facilities" (Def. Ltr. to S.M. Keller, July 7, 2023, Exh. J at 16) and its Paragraph 3 Disclosures listed non-custodial data sources such as share file repositories/drives located at one or more of HID's facilities, along with its source code. Vector Flow had every right to rely on counsel's representations that all HID custodial sources were identified and searched during HID's collection process. During depositions of HID witnesses, however, it became clear that this was not accurate. HID while blaming Vector

---

[1] I will address the "Deployment" folder separately below.

Flow for finger-pointing, HID does just that in its responsive letter on this issue. While HID "readily certifies that is has done a fulsome search of central repositories to provide relevant discovery," when asked at the argument which non-custodial sources were searched, Teams, SharePoint/OneDrive, the CRM and financial databases were again not mentioned. Nor were any reasons provided for why they were not searched. HID does not outline what specific burden it would incur in having to go back and search these repositories other than the timing of the case and potential "escalat[ion] of costs." (Pltf. Ltr. to S.M. Keller, dated July 10, 2023, at 1-2). For the same reasons articulated in my June 11, 2023 Memorandum Order, I find this information responsive and relevant pursuant to Rule 26 and HID has not demonstrated any burden in its production. That said, I appreciate Vector Flow's proposal to try and narrow the potential production for both sides, and I therefore order only that HID must produce: a complete listing of all central repositories at HID with a description of documents maintained there and a screenshot of the folder structure (where one exists). When listing the repositories, if a repository has already been searched, and responsive documents produced, HID should note such on the listing. This listing should be produced as soon as possible, but no later than Wednesday, July 19, 2023. Following receipt of the listing, the parties should meet and confer in good faith as to whether any production needs to be made, and whether they can agree to some narrow form of production given the stage of the case. I will not reopen depositions in response to any of these documents absent a showing of good cause.

      2. The "Deployment" Folder

During the deposition of HID's witness Mr. Schmidt, he mentioned a "Deployment" or similarly named folder that HID uses to hold documents shared with customers regarding their deployments. (Def. Ltr. to S.M. Keller, dated July 7, 2023, at 4 and Exh. N at 199:1-202:22).

He further stated that he did not think these documents were collected for the litigation. (*Id.* at Exh. N at 200:23-25). Vector Flow argues that these documents are responsive to at least its RFPs 5-15, 20, 24, 28. (*Id.* at 4 and Exh. A). Vector Flow argues that these documents are relevant to at least damages, and potentially the trade secret claim[2]. As to damages, Vector Flow argues that these documents may contain information about why HID lost customers. (*Id.* at 4). At argument, Vector Flow acknowledged the size of this folder and proposed narrowing the universe of documents to those related to customers that have left HID since 2018 (which Vector Flow estimates to be around 30), or at a minimum, the documents for the "handful" of customers HID lost to Vector Flow.

    I have struggled in reaching a decision on this dispute. What is clear to me is that for the same reasons as described above, and in earlier decisions, this is a repository that should have been disclosed and searched from the beginning. No one disputes that the folder may contain responsive documents.[3] And based on Mr. Schmidt's testimony, it seems like it may in fact contain responsive documents such as customer specifications, design, scope of work documents, standard operating procedures, spreadsheets on configurations, etc. which are relevant to issues such as lost profits and potentially what protections HID took to protect its alleged trade secrets. (*Id.* at Exh. N at 199:22-200:3). That said, this is one instance in which HID does articulate a specific burden. HID states that there are 276 customer level folders on

---

[2] The relevance as to the trade secret claim was not in Vector Flow's opening letter brief, but was discussed at the argument on the motion.

[3] The disputes in this case further underscore the need for parties in every case to conduct a fulsome Rule 26(f) conference and discussion around electronic discovery and for counsel to conduct an extensive interview process at the beginning of the litigation. The identities of these non-custodial sources were disclosed by witnesses initially disclosed by both parties (Vector Flow in the earlier dispute and HID here) in the litigation and should have been discovered at a minimum, when conducting those witness interviews.

10

this cloud-based server and it spans "over a terabyte of data." HID further argues that similar to Vector Flow's refusal to produce its customer implementation documents because of customer confidentiality issues, it would need to get customer permission to produce their customer documents here. While I find the Vector Flow customer implementation distinguishable because that data was not in the possession, custody or control of Vector Flow, I do have some concern about the breadth of this customer information requested from HID and the time in the case schedule. Given where we are in the litigation, I order that HID need only produce documents from the folders concerning the customers that left HID for Vector Flow since 2018. I do not believe there to be any concern about the production of these documents since the server/folder is HID's cloud-based server and HID has control of its data. Again, absent a showing of good cause, no additional depositions will be allowed on these documents. Once the production is made, HID should provide me with the costs of production and results and the Special Master will consider a sharing of these costs between the parties.

    **C. Issue 3**: Vector Flow's request for further supplementation of Interrogatory Nos. 22 and 24

Vector Flow argues that HID should further supplement Interrogatory No. 22 and that in its earlier supplementation it failed to comply with the Special Master's June 13 Order. (Def. Ltr. to S.M. Keller, dated July 7, 2023, at 4). The Special Master ordered that "HID supplement its response to include at a minimum, a reference to all documents responsive to this interrogatory and to identify any stated reason by any customer at any time about why it stopped being a customer." (D.I. 302 at 2-3). I find that HID did comply with my order by identifying additional documents including by identifying documents by Bates number pursuant to Rule 33(d) and incorporating by reference deposition transcripts and exhibits. HID states in its responsive letter that its response to this interrogatory "is complete." (Pltf. Ltr. to S.M. Keller,

dated July 10, 2023, at 5). I further understand from argument that Vector Flow has questioned at least six witnesses on the topics covered by this interrogatory. I previously stated in my June 13 order, "to the extent all information is already identified, I cannot order anything further." (D.I. 302 at 3). HID states that this response is complete and will need to live with its content in this litigation. There will be no further supplementation required, but HID will not be permitted to rely on any additional documents or arguments not contained in this response in expert reports or at trial.

Following the parties' letter submissions and argument on the motion, I understand the issue concerning HID's response to Interrogatory No. 24 to be moot.

      **D. Issue 4**: Vector Flow's request that HID re-produce the Salesforce documentation at HID-02592065 to include omitted information

I previously ordered HID to produce documentation from its Salesforce database reflecting customer win/loss information. Following that ruling, HID produced a spreadsheet exported from Salesforce providing some customer relationship information. (Def. Ltr. to S.M. Keller, dated July 7, 2023, at 5, Exh. Q). Vector Flow argues that this export is insufficient because it excludes information about "renewals" and it is limited to one employee's role, that employee being Phil Buck. (*Id.* at 5). HID states that the exported data is not limited by the employee role because they used Mr. Buck as the custodian in pulling the data since he has the highest level of access to SAFE product details within Salesforce. (Pltf. Ltr. to S.M. Keller, dated July 10, 2023, at 4). On a review of the spreadsheet (HID-02592065), it does appear that renewals were not included in this data set. (*Id.* at Exh. Q (noting data "filtered by" "Project Type not equal to Renewal")). At argument, HID's counsel represented that renewals are not tracked in Salesforce and noted that it has already provided an interrogatory response that sets forth all current and past customers, denoting those customers who did not renew in red. HID's

counsel also stated during argument that they re-ran the spreadsheet without any limiters and the spreadsheet still did not provide the renewal information. Mr. Buck at his deposition further stated only that renewal information could "potentially be stored" in Salesforce, but went on state that the more likely source would be with the renewal managers. (Buck Depo. Tr. at 120:10-19; 120-124, generally). Given that the custodian used had the highest level of access, the testimony of Mr. Buck ,and counsels' representations that re-running the spreadsheet did not provide any further information on renewals, I deny this portion of Vector's Flow's motion and will not order HID to otherwise produce another version of this spreadsheet.

Dated: July 16, 2023                                    */s/ Karen E. Keller*
                                                        Special Master Karen E. Keller, Esq.